# EXHIBIT B

**Declaration of Moshe Gold**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Involuntary Chapter 11 |
| Moshe Gold | Case No. 24-43647 (NHL) |
| Alleged Debtor. | |

## DECLARATION OF MOSHE GOLD

I, Moshe Gold, hereby declares under penalty of perjury that the following statements are true and correct:

1.      I am the owner of 10 Mountainview LLC ("Mountainview LLC"), and I am fully familiar with the facts set forth herein.  I submit this declaration in support of the Motion to Dismiss the Involuntary Petition (the "Motion") for entry of an order, pursuant to 11 U.S.C. § 303 and Federal Rule of Bankruptcy Procedure Rule ("Bankruptcy Rule") 1011(b), and E.D.N.Y. Local Bankruptcy Rule 1013-1(c): (i) dismissing the involuntary chapter 11 petition against myself; (ii) awarding costs and attorney's fees pursuant to 11 U.S.C. §303(i)(1); (iii) awarding punitive damages pursuant to 11 U.S.C. § 303(i)(2); and (iv) for such other and further relief this Court deems just and proper.

**The Viewstar Mortgage Loans**

2.      Yoel Abraham ("Abraham") is the former owner of Viewstar LLC ("Viewstar") which owns the real property commonly known as 10 Mountainview Road, Upper Saddle River, New Jersey 07458 (the "Property").

3.      Mountainview LLC holds a junior secured lien against the Property pursuant to that certain junior mortgage lien dated April 1, 2020 (the "Junior Mortgage"), which secures a loan

from Mountainview LLC to Viewstar in the original principal amount of $4,200,000.00 (the "<u>Junior Mortgage Loan</u>").

4.      The Property is also encumbered by a senior mortgage lien dated April 1, 2020 (the "<u>Senior Mortgage</u>") securing a loan (the "<u>Senior Mortgage Loan</u>") from Sterling National Bank ("<u>Sterling</u>") to Viewstar in the restated original principal amount of $12,600,000.00. By virtue of certain alonges and assignments executed by Sterling, RREF IV-D SN Portfolio, LLC (the "<u>Senior Mortgagee</u>") is the holding of the Senior Mortgage.

**<u>The Operating Agreement and the Springing Member</u>**

5.      In connection with the Junior Mortgage Loan, Mountainview LLC and Abraham, the 100% owner of Viewstar at the time of the origination of the Junior Mortgage Loan, entered into an Operating Agreement for Viewstar dated April 1, 2020 (the "<u>Operating Agreement</u>") pursuant to which Abraham was appointed the Managing Member and the Mountainview LLC was the "Springing Member." A copy of the Operating Agreement is annexed as **<u>Exhibit 1</u>** to this Declaration.

6.      Article 4.1(j) of the Operating Agreement provides that, "upon and after a Springing Member Event, the Springing Member shall have the right to remove and appoint a new Manager and/or remove and replace [Abraham] as the Managing Member of [Viewstar]." Under the Operating Agreement, a "Springing Member Event" includes (i) the default of any mortgage, note, or loan agreement affecting the Property, and (ii) the transfer of membership interests in Viewstar that causes Abraham to no longer remain in control of Viewstar without Mountainview LLC's consent. Operating Agreement Art. 4.1(j)(iii) & (viii).

**<u>The Foreclosure Action</u>**

7.      In July 2022, Viewstar failed to make certain required payments under the Senior Mortgage Loan, and the Senior Mortgagee delivered default notices to Viewstar in connection with

Viewstar's default.  Thereafter, Abraham, without Mountainview LLC's consent, executed an Assignment and Agreement dated August 2, 2022, purporting to assign Abraham's membership interests in Viewstar to 10 Mountainview Holdings, LLC, an entity owned by Hershel Blumenberg ("Blumenberg") for $10 dollars (the "Assignment"), a copy of the Assignment is annexed as **Exhibit 2**.  10 Mountainview Holdings LLC is not affiliated with Mountainview LLC or myself.

8.      On September 12, 2022, Mountainview LLC sent Viewstar a "Notice of Springing Event/Notice of Default," notifying Viewstar that a Springing Member Event had occurred and Mountainview LLC must therefore be admitted as a managing member and manager of Viewstar. Abraham directed his counsel, Kasowitz Benson Torres LLP, to send a response letter denying that the Springing Member Event had occurred, a copy of the letter is annexed as **Exhibit 3**.

9.      As a result of Viewstar's defaults, on September 28, 2022, the Senior Mortgagee commenced a foreclosure action (the "Foreclosure Action") in the Superior Court of New Jersey, Bergen County (the "State Court"), to foreclose on the Senior Mortgage.  In the Foreclosure Action, the State Court appointed a rent receiver (the "Receiver") to monitor the Property during the pendency of the Foreclosure Action.  On March 7, 2024, the State Court awarded the Senior Mortgagee a Final Judgment in Foreclosure and Sale (the "Foreclosure Judgment").

10.     On or about June 19, 2024, the Sheriff of Bergen County noticed a foreclosure sale of the Property scheduled for July 26, 2024, at 12:00 p.m. (the "Foreclosure Sale").

**The Springing Member Action**

11.     On January 27, 2023, Mountainview LLC commenced its own action (the "Springing Member Action") against Viewstar, Abraham, 10 Mountainview Holdings LLC and Blumenberg to, among other things, enforce Mountainview LLC's right under the Operating Agreement to exercise the Springing Member provision to replace Abraham as the Managing Member and remove Abraham as Manager.

12.     By decision and order entered in the Springing Member Action on November 29, 2023, the State Court granted in part Mountainview LLC's motion for summary judgment to the extent that Mountainview LLC was entitled to become the Springing Member of Viewstar.  By Written Consent in Lieu of a Meeting of the Managing Member of Viewstar LLC dated November 29, 2023 (the "Written Consent"): (i) Mountainview LLC replaced Abraham as the Managing Member, and (ii) Abraham was removed as Manager.  A copy of the Written Consent is annexed as **Exhibit 4** to this declaration.

13.     On August 12, 2024, Viewstar retained Lee E. Buchwald to serve as its Restructuring Officer.

**Viewstar Involuntary Chapter 7 Case**

14.     On July 26, 2024, just hours before the scheduled Foreclosure Sale of the Property, an individual named Deahn Meir[1], purporting to be a creditor of Viewstar (the "Viewstar Petitioning Creditor") filed an involuntary chapter 7 petition against Viewstar in the Bankruptcy Court in the District of New Jersey (the "New Jersey Bankruptcy Court").  *In re: Viewstar LLC*, Case No. 24-17410 (RG), ECF No. 1 (Bankr. D.N.J. 2024) (the "Viewstar Involuntary Chapter 7 Case").  At the Foreclosure Sale, Abraham, after we found out about the stay, made comments about me being  foolish to think a sale would ever occur.

15.     The Viewstar Petitioning Creditor never served the involuntary summons on Viewstar.  In fact, other than filing the involuntary chapter 7 petition against Viewstar, the

[1] I believe the Viewstar Petitioning Creditor is named "Deahn Meir", but I cannot confirm because the purported creditor listed their name in a contradictory manner in the involuntary petition, writing "Meir Deahn" in some filings and "Deahn Meir" in others. Further, when the senior lender sent a process server to find Meir the individual who answered the door at the listed address had no idea who the person was.

Viewstar Petitioning Creditor filed no other pleadings and took no other action in the Viewstar Involuntary Chapter 7 Case.

**Viewstar Chapter 11 Case**

16.     On August 15, 2024, Viewstar filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Southern District of New York.  *In re Viewstar LLC*, Case No. 24-22716, ECF No. 1 (Bankr. S.D.N.Y. 2024) (the "Viewstar Voluntary Chapter 11 Case").

17.     Prior to filing the Viewstar Voluntary Chapter 11 Case, Viewstar conferred with counsel for the Senior Mortgagee and Mountainview LLC, both of whom supported a bankruptcy proceeding for Viewstar through the Viewstar Voluntary Chapter 11 Case with venue in the Southern District of New York, rather than through the Viewstar Involuntary Chapter 7 Case.

18.     On August 15, 2024, Viewstar filed a *Motion Pursuant to Bankruptcy Rule 1014(b) For Entry of An Order (I) Determining That the Voluntary Chapter 11 Case Filed in the SDNY Should Proceed, and (II) Dismissing the Involuntary Chapter 7 Case.  In re: Viewstar LLC*, Case No. 24-17410 (RG), ECF No. 10 (Bankr. D.N.J. 2024) (the "Viewstar Motion to Dismiss").

19.     Neither the Viewstar Petitioning Creditor, Abraham, nor any other party-in-interest filed an objection to the Viewstar Motion to Dismiss.

20.     On September 10, 2024, the New Jersey Bankruptcy Court entered an order granting the Viewstar Motion to Dismiss.

21.     On September 24, 2024, Abraham filed a proof of claim in the Viewstar Voluntary Chapter 11 Case.

**Involuntary Chapter 7 Petitions for Moshe Gold and Mountainview LLC**

22.     On September 4, 2024, Abraham commenced an involuntary chapter 11 against me, *In re Moshe Gold*, Case No. 23-43647 (NHL) (Bankr. E.D.N.Y. 2024) (the "Involuntary Chapter 11 Case").

23.     On September 5, 2024, Abraham commenced an involuntary chapter 7 against Mountainview LLC, *In re Mountainview LLC*, Case No. 24-43681 (NHL) (Bankr. E.D.N.Y. 2024) (the "<u>Mountainview Involuntary Chapter 7 Case</u>").

24.     Abraham has a default judgement against me in my individual capacity and Mountainview LLC that was entered by the Supreme Court of the State of New York County of Rockland on March 8, 2021.  Judgement, *Viewstar LLC and Yoel Abraham v. 10 Mountainview LLC and Moshe Gold*, Index No. 33453/2020 (N.Y. Sup. Ct. Rockland Cnty. Mar. 8, 2021), NYSCEF 11.

25.     Abraham has not taken any action to enforce the default judgement other than to take the extreme remedy of filing the Involuntary Chapter 11 Case and the Involuntary Chapter 7 Case.

26.     Abraham has failed to serve an involuntary summons in either the Mountainview Involuntary Chapter 7 Case or this Involuntary Chapter 11 Case and has taken no action in either proceeding.

27.     As of the date of this filing, Abraham's only filing in this case is the involuntary chapter 11 petition that he filed *pro se*.

Dated: September 25, 2024

_____
                Moshe Gold

# EXHIBIT 1

# OPERATING AGREEMENT

## OF

## VIEWSTAR LLC

This **OPERATING AGREEMENT** (this "**Agreement**") of **VIEWSTAR LLC (the "Company")** is entered into as of this 1st day of April, 2020 (the "**Effective Date**"), by and between **Yoel Abraham ("YA" or the "Member")**, an individual with an address at _____ and **10 MOUNTAINVIEW LLC** (the "**Springing Member**") with an address at 63 Flushing Avenue, #245, Brooklyn, New York 11205 (upon a Springing Member Event the Springing Member together with YA are collectively referred to as the "**Members**").

## EXPLANATORY STATEMENT

**WHEREAS**, the Members desire to form and operate a limited liability company under the New Jersey Limited Liability Company Act, as amended from time to time and pursuant to the terms and conditions set forth in this Agreement;

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE 1 -    DEFINITIONS

1.1    **Definitions.**  Each of the following capitalized terms shall have the meaning specified in this Article 1.  Other terms are defined in the text of this Agreement and those terms shall have the meanings respectively ascribed to them throughout this Agreement.

(a)    "**Agreement**" means this Operating Agreement, and the Exhibits and Schedules annexed hereto, all as amended from time to time in accordance with the provisions hereof.

(b)    "**Capital Account**" means the account to be maintained by the Company for each Member as described in Section 6.4.

(c)    "**Capital Contribution**" means the total amount of cash and the fair market value of any other asset contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed or to which the assets are subject, as determined by the Manager.

(d)    "**Certificate of Formation**" means the Certificate of Formation of the Company, as filed with the Department of Treasury of the State of New Jersey, as the same may be amended from time to time.

(e)    "**Code**" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provision or provisions of any succeeding law.

(f)    "**Company**" has the meaning set forth in the preamble to this Agreement.

(g)    "**Distribution**" means any cash and other property paid to a Member by the Company from the operations of the Company, including the sale of the Property.

(h)    "**Fiscal Year**" means the fiscal year of the Company, which shall be the year ending December 31.

(i)    "**Manager**" or "**Managers**" shall mean YA and any successor as appointed by YA or such person or entity as may be appointed by the Springing Member (as applicable), pursuant to Section 4.1(j).

(j)    "**Managing Member**" shall mean YA and its successors or Springing Member (as applicable) as provided in Section 4.1(j).

(k)    "**Member**" means each person signing this Agreement as a Member, the Springing Member upon a Springing Member Event and any Person who subsequently is admitted as a member of the Company. Any reference herein to the Members of the Company shall be to the then Members of the Company.

(l)    "**Membership Interests**" means all of the rights of a Member in the Company, including such Member's: (i) right to share in the Profits and Losses of the Company; (ii) right to inspect the Company's books and records; (iii) the right to participate in the management of and vote on matters coming before the Members, to the extent provided in this Agreement, and (iv) to the extent permitted under this Agreement, the right to act as an agent of the Company.

(m)    "**New Jersey Act**" means the New Jersey Limited Liability Company Act.

(n)    "**Person**" means any individual, corporation, governmental authority, limited liability company, partnership, trust, unincorporated association or other entity.

(o)    "**Premises**" means that certain real property and improvements commonly known as 10 Mountainview Road, Upper Saddle River, New Jersey.

(p)    "**Property**" means, at any time, all property, whether real or personal, interests, assets or rights owned or held by or on behalf of the Company at such time, including the Premises.

(q)    "**Redemption Amount**" means, with respect to the Springing Member, an amount equal to the unpaid portion of the Springing Member Equity Investment, plus (ii) an additional amount required to provide the Springing Member a four and one-half percent (4.5%) annual return on the outstanding Springing Member Equity Investment.

(r)      "**Reserve**" means reasonable amounts set aside and deemed sufficient by the Manager, as of the date of determination, for working capital and to pay taxes, insurance, debt service, or other costs and expenses incident to the operation of the Company.

(s)      "**Springing Member Equity Investment**" means an amount equal to (i) Four Million Two Hundred Thousand and 00/100 Dollars ($4,200,000.00), plus (ii) any additional Capital Contributions made by Springing Member after the Effective Date, if permitted to do so pursuant to this Agreement (i.e., after Springing Member replaces the Manager and/or Managing Member pursuant to Section 4.1 (j) below), plus (ii) any loans made by Springing Member to the Company, if permitted to do so pursuant to this Agreement (i.e., after Springing Member replaces the Manager and/or Managing Member pursuant to Section 4.1(j) below), plus (iii) all costs and expenses of Springing Member, including attorneys' fees, which may be incurred in enforcing any of the terms of this Agreement.

(t)      "**Springing Member Event**" has the meaning ascribed to it in Section 4.1(j).

(u)      "**Treasury Regulations**" means the treasury regulations, including any temporary regulations, promulgated under the Code from time to time, as the same may be amended from time to time.

## ARTICLE 2 -       ORGANIZATION

2.1      **Formation.**   The Company was formed upon the filing of the Certificate of Formation with the Department of Treasury of the State of New Jersey pursuant to the New Jersey Act.

2.2      **Name.**   The name of the Company is Viewstar LLC.

2.3      **Principal Place of Business, Registered Office and Registered Agent.**   The location of the principal place of business and registered office of the Company is as set forth in the Certificate of Formation or such other location as may hereafter be determined by the Manager. The name of the registered agent of the Company for service of process on the Company at such address is as set forth in the Certificate of Formation.

2.4      **Term.**   The term of the Company began upon the filing of the Certificate of Formation and shall continue until terminated pursuant to this Agreement or the New Jersey Act.

2.5      **Purposes.**  The Company is formed for the specific purpose for which the Company has been formed is to directly or indirectly (through one or more subsidiaries) acquire, operate, manage, develop and own the Premises. Legal title to all property of the Company shall be held, vested and conveyed in the name of the Company and no real or other property of the Company shall be deemed to be owned by the Members individually.  The Membership Interests of each Member shall constitute personal property.

## ARTICLE 3 -       MEMBERS

3.1      **Names and Addresses.**   The names and addresses of the initial Member and their respective initial Membership Interests are as set forth in **Exhibit "A"** to this Agreement.  From

time to time after the date hereof **Exhibit "A"** shall be deemed amended to reflect the admission or withdrawal of a Member or the issuance or redemption of a Membership Interest or the contribution of additional capital.

3.2     **Voting Rights of Members**.  Except as otherwise specifically provided herein, in the New Jersey Act or in other applicable law, only the Managing Member shall have the right to vote on or consent to matters.

3.3     **Additional Members.**  A Person may be admitted as a Member after the date of this Agreement only upon the consent of the Managing Manager.

3.4     **Books and Records.**  The Company shall keep books and records of accounts and other records necessary for the operation of the Company and minutes of all meetings of the Members. Such books and records shall be maintained on a cash basis in accordance with this Agreement.

3.5     **Information.**  Each Member may inspect during ordinary business hours and at the principal place of business of the Company the Certificate of Formation, the Operating Agreement, the minutes of any meeting of the Members, books and records of the Company and any tax returns of the Company for the immediately preceding three Fiscal Years.

3.6     **Limitation of Liability.**  Each Member's liability shall be limited as set forth in this Agreement, the New Jersey Act and other applicable law.  A Member shall not be personally liable for any indebtedness, liability or obligation of the Company, except that such Member shall remain personally liable for the payment of the Capital Contribution of such Member and as otherwise set forth in this Agreement, the New Jersey Act and any other applicable law.

3.7     **Sale of All Assets**.  Except as provided for in Section 4.1(d)(x), the Managing Member shall have the sole right to approve the sale, lease, exchange or other disposition of all or substantially all of the assets of the Company.

3.8     **Priority and Return of Capital.**  Except as provided in Article 7 and Article 8, no Member shall have priority over any other Member, whether for the return of a Capital Contribution or for Profits, Losses or a Distribution; provided, however, that this Section shall not apply to loans or other indebtedness (as distinguished from a Capital Contribution) made by a Member to the Company.

3.9     **Liability of a Member to the Company.**  A Member who or which rightfully receives the return of any portion of a Capital Contribution is liable to the Company only to the extent now or hereafter provided by the New Jersey Act.  A Member who or which receives a Distribution made by the Company in violation of this Agreement or made when the Company's liabilities exceed its assets (after giving effect to such Distribution) shall be liable to the Company for the amount of such Distribution.

3.10    **Financial Adjustments.**  No Members admitted after the date of this Agreement shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company.  The Managing Member may, in its discretion, at the time a new Members is admitted, close the books and records of the Company (as though the Fiscal Year had ended) or

make pro rata allocations of loss, income and expense deductions to such Member for that portion of the Fiscal Year in which such Member was admitted in accordance with the provisions of the Code.

3.11    **Springing Member Event.**    Upon the occurrence of a Springing Member Event, Springing Member shall, without any action of any Person and simultaneously with the Springing Member Event, automatically be admitted to the Company as Managing Member subject to the provisions of Section 4.


# ARTICLE 4 -     MANAGEMENT

4.1    **Management**.

(a)    YA, as Managing Member, does hereby designate and appoint YA, as Manager of the Company, and such Manager shall have the right to appoint directors, officers and agents of the Company.  YA, shall have the right to remove the Manager in its sole discretion and appoint a substitute Manager.  Subject to Section 4.1(d) hereinbelow, all decisions on behalf of the Company shall be made by the Manager.

(b)    The Manager(s) shall at all times be entitled to designate the total number of directors constituting the Board of Directors and to designate all agents and officers of the Company.

(c)    Whenever any director, agent or officer previously designated by the Manager(s) cease(s) to serve (whether by reason of death, incapacity, resignation or otherwise), then the Manager shall be entitled to designate a successor agent or officer to fill the vacancy thereby created.

(d)    Notwithstanding the foregoing, the Company shall not (and the Managing Member and/or the Manager shall not, on behalf of the Company) take the following "Major Actions" without the prior written consent from Springing Member, nor shall the Company (and the Managing Member and/or Manager shall not, on behalf of the Company) allow any subsidiary of the Company to take such Major Actions without the consent of Springing Member:

(i)    the entering into any loan or refinancing after the date hereof, and the mortgaging, pledging or encumbering of all or any part of the assets of the Company (or any subsidiary) or any interest of the Company (or any subsidiary) as security therefor, or the modification or amendment of any loan, or the modification of any such mortgage, pledge or encumbrance as security therefor; provided however that the foregoing shall not apply to (A) the loan being made by Sterling National Bank to the Company on the date herof or (B) a loan made by an affiliate of YA and further provided that such loan shall be fully subordinated to any interest of Springing Member in the Company or the Premises;

- 5 -

(ii)         the entering into any agreement requiring the consent of any party to a change of control of the Company (each a "<u>Material Agreement</u>"), and the amendment or termination of any Material Agreement;

(iii)        making any decision with respect to any environmental matters affecting the Company (or any subsidiary) or its assets;

(iv)        admitting any additional members, and no Member shall sell, transfer or encumber their respective interests in the Company without the consent of all the Members. The foregoing notwithstanding, additional members may be admitted to the Company and Members may transfer their respective interests so long as such transfers (1) are made for no consideration, (2) do not cause an event of default under any mortgage encumbering the Premises, and (3) do not cause YA to no longer remain in control of the Company;

(v) the filing of a petition for relief under applicable bankruptcy code, making an assignment for the benefit of creditors, applying for the appointment of a custodian, receiver or trustee for the Company, or any of its subsidiaries or any of the Company's or its subsidiaries' properties, consenting to any other bankruptcy or similar proceeding, consenting to the filing of such proceeding or admitting in writing the Company's (or any subsidiary's) inability to pay their respective debts generally as they become due;

(vi) merging or consolidating the Company or its subsidiaries with or into any other entity or person.

The Members acknowledge and agree that upon the repayment of the Redemption Amount, the consent of the Springing Member shall not be required for any Major Actions, and the Springing Member shall be redeemed pursuant to Section 8.3 below.

(e)         The Manager(s) is/are hereby authorized to decide whether or not the Company (or any subsidiary) is to sell any of its assets, and is/are hereby authorized to be the designated signatory in effectuating said sale(s) of the Company's assets.

(f)         Subject to Section 4.1(d) hereinabove, the Manager(s) shall have the sole right to vote on behalf of the Company.

(g)         Except as otherwise provided for in this Agreement, the Manager(s) shall have the sole power to do any and all acts necessary or convenient to or for the furtherance of the purposes described herein, including without limitation to obtain financing for the Company and/or its subsidiaries and/or the Premises.

(h)         No Member other than the Manager(s) shall have any authority to bind the Company to any third party with respect to any matter except pursuant to a resolution expressly authorizing such action which resolution is duly adopted by the Manager(s).

(i)        Except as otherwise provided for in this Agreement, the Manager(s) shall be responsible for policy setting, approving the overall direction of the Company and making all decisions affecting the business and affairs of the Company.

(j)        Upon and after a Springing Member Event the Springing Member shall have the right to remove and appoint a new Manager and/or remove and replace YA as the Managing Member of the Company.   Except as otherwise provided for in this Agreement, upon the replacement of a Manager, such replacement Manager shall be bound by the same obligations, fiduciary and otherwise, of the current Manager of the Company, as set forth herein and under the New Jersey Act.  A Springing Member Event shall mean the occurrence of one or more of the following events:

> (i)        Manager is convicted (or enters a guilty plea, or nolo contendere plea in connection therewith) of any felony and in connection with such conviction is incarcerated for a minimum of thirty (30) days;
>
> (ii)        Manager being found (after exhaustion of all appeals) by a court of competent jurisdiction to have defrauded the Company, the Springing Member or any lender with a mortgage on the Premises or any mezzanine lender of the Company;
>
> (iii)        The taking of any action which constitutes a Major Action without the Springing Member's prior written approval;
>
> (iv)        It has been determined by a court of competent jurisdiction that there has been fraud or willful misconduct in the performance of Manager's responsibilities with regard to the Company or any subsidiary;
>
> (v)        It has been determined by a court of competent jurisdiction  that there has a misappropriation of Company or subsidiary funds by the Manager;
>
> (vi)        The death or incapacity (as determined by a court of competent jurisdiction) of Manager and a replacement manager is not appointed to the satisfaction of Sterling National Bank;
>
> (vii)        The failure to pay the Redemption Amount on or prior to September 10, 2022; and
>
> (viii)        In the event there is (A) a default for non-payment beyond any applicable grace periods, under the terms of any mortgage, note, or loan agreement affecting the Premises, or (B) any other default (other than for non-payment) beyond any applicable grace periods, under the terms of any mortgage, note, or loan agreement affecting the Premises for which the lender exercises its right to demand default interest due to such default and the Company fails to time pay all accrued interest at such default rate.

If a Managing Member is removed as the Managing Member his rights as a Member shall not be affected. If Springing Member removes or replaces the Manager and/or Managing Member pursuant to Section 4.1(j) thereafter the sole management of the Company shall vest with the new Manager and/or Managing Member without any right of the Members to replace the new Manager and/or Managing Member and the consent of the other Members for Major Actions as set forth in Section 4.1(d) shall no longer be required. The Members acknowledge that in the event Springing Member appoints a new Manager and/or Managing Member pursuant to Section 4.1(j) Springing Member shall be entitled to make additional capital contributions to the Company as may be commercially reasonable, shall be entitled to make Distributions to itself from excess cash flow until it fully receives the Redemption Amount and shall have the right to sell the Premises at a price and terms decided solely by Springing Member and that the proceeds from said sale may only be enough to make Distributions to Springing Member towards the Redemption Amount without any of the other Members being entitled to a Distribution. Notwithstanding anything contained herein to the contrary, in connection with the occurrence of an event which constitutes a Springing Member Event pursuant to clause (i) or (vi) above, the Managing Member shall have thirty (30) days to replace the Manager prior to Springing Member being entitled to pursue its remedies pursuant to this Section 4.1(j). Notwithstanding anything to the contrary herein, if after a Springing Member Event the Springing Member desires to sell the Premises, the Springing Member shall designate a reputable national real estate brokerage company (the "Agent") to offer the sale of the Premises through a public offering at a price as reasonably determined by the Agent to be the fair market value (the "Offering Price"). The Springing Member shall not be authorized to accept any offer that is lower than ten (10) percent of the Offering Price.

4.2    **Officers, Agents.**    The Manager may from time to time designate such officers and agents as it may deem necessary to carry out the day-to-day operations of the Company.  Such officers and agents shall have such duties, powers, responsibilities and authority as may from time to time be prescribed by the Manager, and may be removed at any time, with or without cause, by the Manager.

4.3    **Indemnification.**    The Company shall indemnify and hold harmless the Managing Member, the Manager and any officer or agent from and against all claims and demands to the maximum extent permitted under the New Jersey Act.

4.4    **Salaries.**    No salaries or other compensation (except for distributions under this Agreement to Members and payments under Section 9.1) shall be paid to any Member, Manager or affiliate thereof, except as may be approved by the Members unanimously.  All affiliate transactions shall be for services actually performed in connection with the operations of the Company shall be on terms and conditions that are commercially reasonable and substantially similar to those that would be available on an arm's-length basis with unaffiliated third parties.

## ARTICLE 5 -    MEETINGS OF MEMBERS

5.1    **Meetings.**  Meetings of the Members, in the event there are two or more, for any purpose or purposes, may be called by the Manager(s) or one of the Members.

5.2    **Place of Meetings.**  Meetings of the Members may be held at any place, within or outside the State of New Jersey, for any meeting of the Members designated in any notice of such meeting.  If no such designation is made, the place of any such meeting shall be the chief executive office of the Company.

5.3    **Notice of Meetings.**  Written notice stating the place, day and hour of the meeting indicating that it is being issued by or at the direction of the person or persons calling the meeting, stating the purpose or purposes for which the meeting is called shall be delivered no fewer than ten nor more than sixty days before the date of the meeting.

5.4    **Record Date.**  For the purpose of determining the Members entitled to notice of or to vote at any meeting of Members or any adjournment of such meeting, or Members entitled to receive payment of any Distribution, or to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring Distribution is adopted, as the case may be, shall be the record date for making such a determination; provided that if the Members shall lose their right to vote or does not have a right to vote on a specific matter, then they shall not be permitted to vote at such meeting.

5.5    **Quorum.**  Subject to the provisions of this Agreement, and specifically Section 3.2, the vote of the majority of Members (based on such Member's membership  interest in the company) is/are required to be present to constitute a quorum at any meeting of Members.

5.6    **Manner of Acting.**  If a quorum is present at any meeting, except as otherwise provided in this Agreement, including Section 4.1(d), the vote or written consent of a plurality of the Members but not less than two Members shall be required to approve such action, unless a greater vote of the Members is otherwise required by the New Jersey Act, the Certificate of Formation or this Agreement, wherein such vote or written consent of the Members shall be required to approve such action.

5.7    **Waiver of Notice.**  Notice of a meeting need not be given to any Member who submits a signed waiver of notice, in person or by proxy, whether before or after the meeting.  The attendance of any Member at a meeting, in person or by proxy, without protesting prior to the conclusion of the meeting the lack of notice of such meeting, shall constitute a waiver of notice by such Member.

## ARTICLE 6 -    CAPITAL CONTRIBUTIONS

6.1    **Capital Contributions.**  Each Member has contributed or shall contribute the amount set forth in **Exhibit "A"** to this Agreement as the initial Capital Contribution to be made by such Member.

6.2    **Additional Contributions.**   No additional capital is required to be paid by any Member; provided, however, the Manager may call additional capital to the extent commercially reasonable to do so, and the Managing Member shall have the right to contribute such additional capital.

6.3    **Intentionally Omitted**.

6.4    **Capital Accounts.**   A Capital Account shall be maintained for each Member.   Each Member's Capital Account shall be increased by the value of each Capital Contribution made by the Member, the amount of any Company liabilities assumed by the Member (or which are secured by Company property distributed to such Member), allocations to such Member of the Profits and any other allocations to such Member of income pursuant to the Code.   Each Member's Capital Account will be decreased by the value of each Distribution made to the Member by the Company, the amount of any liabilities assumed by the Company (or which are secured by property contributed to the Company by such Member), allocations to such Member of Losses and other allocations to such Member pursuant to the Code.

6.5    **Transfers.**   Upon a permitted sale or other transfer of a Membership Interest in the Company, the Capital Account of the Member transferring such Member's Membership Interest shall become the Capital Account of the Person to which or whom such Membership Interest is sold or transferred in accordance with Section 1.704-1 (b)(2)(iv) of the Treasury Regulations.

6.6    **Modifications.**  The manner in which Capital Accounts are to be maintained pursuant to this Section is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder.   If in the reasonable opinion of the Manager the manner in which Capital Accounts are to be maintained pursuant to this Agreement should be modified to comply with Code Section 704(b) or the Treasury Regulations, then the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members.

6.7    **Deficit Capital Account.**  Except as otherwise required in the New Jersey Act or this Agreement, no Member shall have any liability to restore all or any portion of a deficit balance in a Capital Account.

6.8    **Withdrawal or Reduction of Capital Contributions.**   A Member shall not receive from the Company any portion of a Capital Contribution until all indebtedness, liabilities of the Company, except any indebtedness, liabilities and obligations to Members on account of their Capital Contributions, have been paid or there remains property of the Company, in the sole discretion of a majority in interest of the Members, sufficient to pay them.   A Member,

irrespective of the nature of the Capital Contribution of such Member, has only the right to demand and receive cash in return for such Capital Contribution.

## ARTICLE 7 -     ALLOCATIONS AND DISTRIBUTIONS

7.1     **Allocations of Profits and Losses.**  The Company's profits and losses shall be allocated as most fairly represents the financial interests of the Members in the Company.

## ARTICLE 8 -     DISTRIBUTIONS

8.1     **Distributions.**    Provided (1) a Springing Member Event has not occurred, (2) a Distribution shall not cause an event of default under the terms of any mortgage, note, or loan agreement affecting the Premises, and (3) after the Distribution the Company shall have sufficient funds in its operating account to pay all of the Company's obligations that have matured and are due and owing, the Company may make Distributions to YA. The foregoing notwithstanding, after a Springing Member Event described in Section 4.1(j)(i)-(vi) has occurred and further provided that conditions 2 and 3 above are satisfied, the Company may make a Distribution to YA if the source of funds for the Distribution is cash generated from rental activity at the Premises and at the time of such Distribution the Agent certifies that the amount of the Offering Price would provide the Company with enough proceeds from the sale of the Premises to satisfy all creditors of the Company, including, but not limited to, payment of the Redemption Amount to the Springing Member. After a Springing Member Event described in Section 4.1(j)(vii)-(viii) has occurred the Company shall not make any Distribution to YA until the Redemption Amount has first been paid to the Springing Member.

8.2     **Interest on and Return of Capital Contributions.**  No Member shall be entitled to interest on such Member's Capital Account or to a return of such Member's Capital Contribution, except as specifically set forth in this Agreement.

8.3     **Springing Member Redemption.**  Upon the Company's payment of the full Redemption Amount (which can be made at any time), the Company shall redeem the Springing Member's interests in the Company for $1.00, at which time, the Springing  Member shall have no further rights under this Agreement. All costs and expenses (including transfer taxes, if any) incurred in connection with redeeming Springing  Member's interest in the Company shall be paid for by the Company.

8.4     **Accounting Period.**  The accounting period of the Company shall be the Fiscal Year.

## ARTICLE 9 -     PROPERTY MANAGEMENT

9.1     **Property Management**.  The Company hereby appoints YA, or an entity designated by YA, to manage the Premises for the duration of this Agreement.

## ARTICLE 10 -     TAXES

10.1     **Tax Returns.**  The Manager shall cause to be prepared and filed all necessary federal and state income tax returns for the Company.  Each Member shall furnish to the Company all

- 11 -

pertinent information in its possession relating to Company operations that is necessary to enable the Company's income tax returns to be prepared and filed. The Company shall send to each Member a copy of the Company's tax return and said Member's Schedule K-1 at least 10 business days prior to the due date of said Member's income tax return.

10.2 **Tax Elections.** The Manager shall make the following elections on the appropriate tax returns:

(a) To adopt the calendar year as the Fiscal Year;

(b) To elect to amortize the organizational expenses of the Company and the start-up expenditures of the Company under Code Section 195 ratably over a period of sixty months as permitted by Code Section 709(b); and

(c) Any other election that the Company may deem appropriate and in the best interests of the Members.

Neither the Company nor any Member may make an election for the Company to be excluded from the application of Subchapter K of Chapter 1 of Subtitle A of the Code or any similar provisions of applicable state law, and no provisions of this Agreement shall be interpreted to authorize any such election.

10.3 **Tax Matters Partner.** The Managing Member shall be the "tax matters partner" of the Company pursuant to Code Section 6231(a)(7). Any Member who is designated "tax matters partner" shall take any action as may be necessary to cause each other Member to become a "notice partner" within the meaning of Code Section 6223. The Tax Matters Partner shall reasonably take into account the tax positions of all other Members prior to taking any actions that could likely affect the tax position of such Members. The Members shall cooperate with the Company regarding any tax matters and pay to the Company any taxes paid by the Company on behalf of a Member. These provisions shall survive the termination of the Agreement and the termination of the Company.

## ARTICLE 11 -    TRANSFERABILITY

11.1 **General.**

(a) Transfers of Membership Interests. Except for a transfer for estate planning purposes, a Member may not (directly or indirectly) gift, bequeath, sell, assign, pledge non-economic interest, hypothecate, exchange or otherwise transfer ("**Transfer**") to another Person all or any portion of such Member's Membership Interest without the unanimous written consent of the Members.

(b) Transfers Subject to Terms of Operating Agreement. Any Membership Interest Transferred pursuant to any of the provisions of this Article 11 shall be subject to all of the terms, restrictions, liabilities and rights of this Agreement, all of which shall survive the closing of such Transfer. As a condition of the effectiveness of any Transfer to a Person not theretofore a party to this Agreement, such transferee shall indicate his agreement to become a party to this

Agreement and to receive and hold such Membership Interest subject to all of the terms, restrictions, liabilities and rights of this Agreement by executing an appropriate written agreement to that effect and delivering a copy thereof to the Company and to each Member.

11.2    **Transferee Not a Member**.  No Person acquiring a Membership Interest pursuant to this Article 11 shall become a Member unless such Person is approved by the vote or written consent required by Section 11.1(a), if any.  A transferee of a Membership Interest who has not been admitted as a Member shall have no right to vote or participate in the management of the business and affairs of the Company or to become a Member, but shall be entitled to receive the share of profits, losses and distributions to which the transferor would otherwise be entitled with respect to the transferred Membership Interest.  Furthermore, such transferee is not entitled to have access to information concerning Company transactions, or to inspect or copy any of the Company's books or other records.

## ARTICLE 12 -    DISSOLUTION

12.1    **Dissolution.**  The Company shall be dissolved and its affairs shall be wound up only upon unanimous consent of the Members not to be unreasonably withheld.

12.2    **Winding Up.**  Upon the dissolution of the Company the Manager (or if there is none at such time, then the Members) may, in the name of and for and on behalf of the Company, prosecute and defend suits, whether civil, criminal or administrative, sell and close the Company's business, dispose of and convey the Company's property, discharge the Company's liabilities and distribute to the Members any remaining assets of the Company, all without affecting the liability of Members.  Upon winding up of the Company, the assets shall be distributed as follows:

      (a)    First, to creditors, including any Member who is a creditor, to the extent permitted by law, in satisfaction of liabilities of the Company, whether by payment or by establishment of adequate Reserves, other than liabilities for distributions to Members under the New Jersey Act;

      (b)    Next, to Members and former Members in satisfaction of liabilities for Distributions under the New Jersey Act; and

      (c)    Any balance remaining to the Members in accordance with Section 8.1.

12.3    **Articles of Dissolution.**  Within ninety (90) days following the dissolution and the commencement of winding up of the Company, or at any other time there are no Members, Articles of Dissolution shall be filed with the Department of Treasury of the State of New Jersey pursuant to the New Jersey Act.

12.4    **Deficit Capital Account.**  Upon a liquidation of the Company within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other adjustments for all Fiscal Years, including the Fiscal Year in which such liquidation occurs), the Member shall have no obligation to make any Capital Contribution, and the negative balance of any

Capital Account shall not be considered a debt owed by the Member to the Company or to any other Person for any purpose.

12.5    **Nonrecourse to Other Members.**  Except as provided by applicable law or as expressly provided in this Agreement, upon dissolution, each Member shall receive a return of such Member's Capital Contribution solely from the assets of the Company.  If the assets of the Company remaining after the payment or discharge of the debts and liabilities of the Company are insufficient to return any Capital Contribution of any Member, such Member shall have no recourse against any other Member.

12.6    **Termination.**  Upon completion of the dissolution, winding up, liquidation, and distribution of the assets of the Company, the Company shall be deemed terminated.

## ARTICLE 13 -    GENERAL PROVISION

13.1    **Notices.**  Any notice, demand or other communication required or permitted to be given pursuant to this Agreement shall have been sufficiently given for all purposes if (a) delivered by a nationally recognized courier (e.g., Federal Express) or (b) sent by registered or certified mail, postage prepaid, addressed to the Member or the Company at his, her or its address set forth in this Agreement.  Except as otherwise provided in this Agreement, any such notice shall be deemed to be given on business day after delivery to the courier service for next business day delivery or three business days after the date on which it was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as set forth in this Section. For the purpose of Section 4.1(d) hereinabove, notice or consent via electronic mail shall be deemed sufficient notice.

13.2    **Amendment.**  Except as set forth in a written agreement, this Agreement contains the entire agreement among the Members with respect to the subject matter of this Agreement, and supersedes each course of conduct previously pursued or acquiesced in, and each oral agreement and representation previously made, by the Members with respect thereto, whether or not relied or acted upon.  No course of performance or other conduct subsequently pursued or acquiesced in, and no oral agreement or representation subsequently made, by the Members, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall amend this Agreement or impair or otherwise affect any Member's obligations pursuant to this Agreement or any rights and remedies of a Member pursuant to this Agreement.  No amendment to this Agreement shall be effective unless made in a writing duly executed by a majority of the Members and the Manager and Springing Member, whose consent shall not be unreasonably withheld.

13.3    **Construction.**  Whenever the singular number is used in this Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

13.4    **Headings.**  The headings in this Agreement are for convenience only and shall not be used to interpret or construe any provision of this Agreement.

- 14 -

13.5   **Waiver.**  No failure of a Member to exercise, and no delay by a Member in exercising, any right or remedy under this Agreement shall constitute a waiver of such right or remedy.  No waiver by a Member of any such right or remedy under this Agreement shall be effective unless made in a writing duly executed by all of the Members and specifically referring to each such right or remedy being waived.

13.6   **Severability.**  Whenever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law.  However, if any provision of this Agreement shall be prohibited by or invalid under such law, it shall be deemed modified to conform to the minimum requirements of such law or, if for any reason it is not deemed so modified, it shall be prohibited or invalid only to the extent of such prohibition or invalidity without the remainder thereof or any other such provision being prohibited or invalid.

13.7   **[Intentionally Omitted.]**

13.8   **Binding.**  This Agreement shall be binding upon and inure to the benefit of all Members, and each of the successors and assigns of the Members, except such right or obligation of a Member under this Agreement that may not be assigned by such Member to another Person without first obtaining the written consent of all other Members.

13.9   **Counterparts**.  This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. A facsimile or electronic mail signature hereof shall be deemed an original.

13.10   **Governing Law.**  This Agreement shall be governed by, and interpreted and construed in accordance with, the laws of the State of New Jersey, without regard to principles of conflict of laws.

13.11   **Entire Agreement**.  This Agreement shall constitute the entire agreement among the Members with respect to the subject matter hereof and shall supersede all previous promises, agreements, conditions, understandings, representations and warranties among the Members with respect to the Company and the business of the Company.

13.12   **Exculpation and Indemnification.**

(a)   Springing Member and/or any Manager appoint by Springing Manager pursuant to Section 4.1(j) (collectively, the "Covered Persons") shall not be liable to the Company or any other Person that is a party to or is otherwise bound by this Agreement, for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Persons on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct.

(b)   To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company and the Members for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such

Covered Person on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this, except that no Covered Person shall be entitled to be indemnified in respect of any loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct with respect to such acts or omissions.

(c)     The foregoing provisions of this Section 13.12 shall survive any termination of this Agreement.

13.13    **Other Business.** Springing Member shall not be obligated to devote any time to the management of the Company. Furthermore,Springing Member and any affiliate of Springing Member may engage in or possess an interest in other business ventures of every kind and description, independently or with others and whether or not competitive with the Company. The Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

**{SIGNATURE PAGE FOLLOWS}**

**IN WITNESS WHEREOF**, the parties have signed or caused this Operating Agreement to be duly signed as of the date first above written.

**COMPANY:**

**VIEWSTAR  LLC**

By: _____
Name:
Title:

**MEMBER(S):**

_____
**YOEL ABRAHAM**

**SPRINGING MEMBER(S):**

**10 MOUNTAINVIEW LLC**

By: _____
Name:
Title:

**IN WITNESS WHEREOF**, the parties have signed or caused this Operating Agreement to be duly signed as of the date first above written.

COMPANY:

VIEWSTAR  LLC

By: _____
Name: Yoel Abraham
Title: Managing Member


MEMBER(S):



_____
YOEL ABRAHAM


SPRINGING MEMBER(S):

10 MOUNTAINVIEW LLC

By: _____
Name: Moshe Gold
Title: Managing Member

- 17 -

**EXHIBIT A**

| Member | Initial Capital Contribution | Percentage Interest |
|---|---|---|
| Yoel Abraham | $ | 100% |

# EXHIBIT 2

## ASSIGNMENT AND AGREEMENT

**THIS ASSIGNMENT AND AGREEMENT** (the "Assignment") is made and entered into as of the 2nd day of August, 2022, by **YOEL ABRAHAM,** with an address at 228 E Route 59, Unit #60, Nanuet NY 10954 (the "Assignor").

**WHEREAS,** the Assignor is the holder of all of the outstanding membership interests (the "Membership Interests") of VIEWSTAR LLC a New Jersey limited liability company (hereinafter referred to as the "Company"), pursuant to the Operating Agreement of the Company (the "Existing Operating Agreement"), a copy of which is attached hereto as <u>Exhibit A</u>; and

WHEREAS, the Assignor desires to assign to 10 Mountain View Holdings LLC, a New Jersey limited liability company with an address at 1318 48th Street, Brooklyn, New York 11219 (the "Assignee") certain Membership Interests in the Company so that the Assignee shall own and hold one hundred percent (100%) of the outstanding Membership Interests in the Company.

NOW THEREFORE, in consideration of Ten Dollars ($10.00) and good and other valuable consideration the receipt and sufficiency of which is hereby acknowledged the parties, intending to be legally bound, hereby agree as follows:

1.      Capitalized terms used but not defined herein shall have the respective meaning assigned such term on Appendix A attached hereto.

2.      Assignor hereby sells, assigns and transfers    ("Sale") unto Assignee all of Assignor's right title and interest in and to one hundred percent (100%) of Membership Interests of the Company, which interests represents one hundred percent (100%) of all of the outstanding membership interests in the Company and Assignor hereby appoints the Assignee as attorney-in-fact to transfer the said Membership Interests on the books of the Company with full power of substitution in the premises.

3.      Assignee agrees to assume on behalf of Assignor the existing mortgages and loans as well as any other liens or encumbrances against the Property as the purchase price (the "Purchase Price") for the Membership Interests; including  the following two mortgages listed on the attached title report:

(a) 10 Mountainview LLC to Sterling National Bank, dated September 16, 2016, and recorded October 26, 2016, in V Book 2419, Page 541, to secure $16,500,000.00.

(b) 10 Mountainview LLC, dated April 1, 2020, and recorded May 5, 2020 in V Book 3590, Page 1642, to secure $4,200,000.00

4.    The Assignor, knowing that the Assignee is relying on the representations and warranties set forth herein in purchasing the Membership Interests of the Company, hereby represents as follows:

(a)    Assignor, immediately prior to the delivery of this Assignment, own one hundred percent (100%) of the issued and outstanding Membership Interests of the Company, free and clear of any Liens or encumbrances of any kind;

(b)    The Company is a limited liability company, duly organized, validly existing and in good standing under the Laws of the State of New Jersey and have full power and authority to conduct the business conducted by the Company as and to the extent now conducted and to own, use and lease its assets;

(c)    The Membership Interests have been duly authorized and validly issued, are fully paid and non-assessable and were not issued in violation of, and are not subject to, any preemptive rights or other similar rights of any person. There is no security, option, warrant, right, call, subscription, agreement, commitment or understanding of any nature whatsoever, fixed or contingent, outstanding that directly or indirectly: (i) calls for the issuance, sale or other disposition of the Membership Interests or securities that are convertible into, or have other rights to acquire, any Membership Interests; or (ii) obligates any of the Company to grant, offer or enter into any of the foregoing; or (iii) relates to the voting or control of Membership Interests or any other capital stock, securities or rights of the Company. No person has any right to require the Company (or any affiliate thereof) to register any securities of the Company (or any affiliate thereof) under the any Federal, State or local Laws;

(d)    For liabilities expressly identified on Schedule 1 attached hereto, to the  best of assignor's knowledge, other than showing on title report, there are no liabilities of, relating to or affecting the Company or its respective Assets or the business conducted by the Company, including, but not limited to, the following:  (x) any liability in respect of any Tax as a transferee or successor to any person; (y) any Tax assessed or proposed to be assessed with respect to the Company's respective income, sales or Assets or the business conducted by the Company, or for which the Company is or may be liable; (z) any assessment, deficiency (including any deficiency relating to possible understatement of revenues or overstatement of expenses) or adjustment related to or in connection with any Tax for which the Company are or may be liable or with respect to the Company's income, sales or Assets or the business conducted by the Company that is or was required to be reported to any Taxing Authority; There are no other liabilities incurred by Assignor on behalf of the LLC companies which have not been revealed to Assignor.

(e)    intentionally omitted

(f)      There are no Actions (including, but not limited to, any Actions pertaining to Taxes or to hiring, unfair labor practices, wages, hours, discrimination, wrongful termination, workers compensation, immigration or employee benefits plans) pending or, to the Knowledge of the Assignor, threatened, against, relating to or affecting the Company, its Assets or the business conducted by the Company that (A) could reasonably be expected to result in the issuance of an Order restraining, enjoining or otherwise prohibiting or making illegal the consummation of any of the transactions contemplated by this Assignment or by the Operating Agreement or otherwise result in a material diminution of the benefits to the Assignee contemplated hereby or thereby, (B) if determined adversely with respect to the Assignor or the Company, could reasonably be expected to result in (x) any injunction or other equitable relief against the Assignor, the Assignee or the Company that could interfere with the business conducted by the Company or with the operations of the Assignee or the Company or (y) Losses incurred by the Assignee or the Company exceeding $5,000, or (C) could reasonably be expected, either alone or in combination with any other Action pending, or to the Knowledge of the Assignor, threatened, against, relating to or affecting the Company, its Assets or the business conducted by the Company, to result in a Material Adverse Effect with respect to the Company; and (ii) there are no facts or circumstances, to the Knowledge of the Assignor, that could reasonably be expected to give rise to any Action that would be required to be disclosed pursuant to clause (i) above;

(g)      The execution and delivery by the Assignor and the Company of this Assignment and, as applicable, the Operative Agreement and the consummation by the Assignor and the Company of the transactions contemplated hereby and thereby will not:

(i)      conflict with or result in a violation or breach of any of, to the extent applicable, the terms, conditions or provisions of the Organizational Documents (as hereinafter defined) of the Company;

(ii)      conflict with or result in a violation or breach of any term or provision of any Law or Order applicable to the Assignor or the Company or any of their respective Assets except for the violation of such Law or Order that would not cause a Material Adverse Effect with respect to the Company; or

(iii)      Except as to existing mortgages of record on the date hereof, (A) conflict with or result in a violation or breach of, (B) constitute (with or without notice or lapse of time or both) a default under, (C) require any of the Assignor or the Company to obtain any consent, approval or action of, make any filing with or give any notice to any Person as a result or under the terms of, (D) result in or give to any Person any right of termination, cancellation, acceleration or modification in or with respect to, (E) result in or give to any Person any additional rights or

entitlement to increased, additional, accelerated or guaranteed payments under, or (F) result in the creation or imposition of any Lien upon the Assets of any of the Assignor or the Company under, any Contract or License to which any of the Assignor or the Company is a party or by which any of the Assignor or the Company or any of their Assets are bound.

(i)    No consent, approval or action of, filing with or notice to any Governmental Authority on the part of any of the Assignor or the Company is required in connection with the execution, delivery and performance of this Assignment or the Operative Agreement or the consummation of the transactions contemplated hereby or thereby except for which the failure to obtain such consent, approval or take such action would not have a Material Adverse Effect with respect to the Company;

(j)    All negotiations relative to this Assignment and the transactions contemplated hereby have been carried out by the Assignor directly with the Assignee without the intervention of any Person on behalf of the Assignor in such manner as to give rise to any valid claim by any Person against the Assignee or the assignors for a finder's fee, brokerage commission or similar payment;

(k)    Neither the Assignor nor the Company is a party to any Contract that by its terms grants a power of attorney, agency or similar authority to any Person, other than the existing mortgages

(l)    The Company is the sole owner of the Real Property;

(m)    All material facts relating to the Company, the Assignor and the business conducted by the Company have been disclosed to the Assignee in or in connection with this Assignment. No representation or warranty contained in this Assignment, and no statement contained in the schedules hereto or in any certificate, list or other writing furnished to the Assignee pursuant to any provision of this Assignment, contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements herein or therein, in the light of the circumstances under which they were made, not misleading;

(n)    If not annexed to be supplied by Assignor, attached hereto as Exhibit D are true, complete, correct and unmodified copies of the following documents (collectively, the "Organizational Documents"): (i) the certified Articles of Organization of the Company, (ii) the Existing Operating Agreement of the Company for each jurisdiction within which the Company is licensed to do business;

(o)     Attached hereto as Exhibit E or to be supplied is true, complete and correct copy of the Title Policy with respect to the Real Property, which Title Policy are each in full force and effect and neither Assignor, nor the Company has committed an "act of the insured" as defined in any policy;

(p)     No Person or entity has an option to purchase the Membership Interests nor the Real Property or any part thereof;

(q)     Assignor, nor the Company, has received an official notice of any condemnation proceedings nor does Assignor or the Company have unofficial information that all or part of any of the Real Property might be taken by eminent domain;

(4)     intentionally omitted

(5)     Any notice to be given under this Assignment shall be deemed duly given if delivered or mailed by certified or registered mail to the party entitled to receive such notice at the address of such party set forth above.

(6)     This Assignment shall be construed according to the laws of the State of New Jersey without regard to the conflict of law rules.

(7)     Each party shall bear its own expenses in connection with the preparation, execution and delivery of this Assignment and the consummation of the transactions contemplated hereby.

(8)     Each party shall execute, acknowledge (if necessary) and deliver such documents, certificates or other instruments and shall take such other action as any of the parties hereto shall reasonably require from time to time to complete the transactions contemplated hereby or as otherwise may be reasonably requested to carry out the intent and purposes of this Assignment.

(9)     In the event of litigation between the parties relating to this Assignment the parties hereby waive any right to trial by jury and agree that prevailing party shall be entitled to recover all costs and expenses of litigation, including but not limited to attorneys' fees and disbursements incurred in connection therewith, including any appellate and post-judgment proceedings. Each of the parties submits to the jurisdiction of any state or federal court sitting in New York County, New York in any action or proceeding arising out of or relating to this Assignment and agrees that all claims in respect of this Assignment shall be heard and determined in any such court. Each party also agrees not to bring any action or proceeding arising out of or relating to this Assignment in any other court. Each of the parties waives any defense of inconvenient forum to the maintenance of any action or proceeding so brought.

(10)    The exhibits, schedules and appendices attached, if any, hereto constitute part of this Assignment.

(11)    This Assignment embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated herein, and all prior agreements, understandings, representations and statements, oral or written, express or implied, are merged into this Assignment.  Neither this Assignment nor any provision hereof may be waived, modified, amended, discharged or terminated except by an instrument signed by the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument, provided, however, that each party hereby authorizes its attorney to agree in writing to any changes in dates and time periods hereunder.

(12)    This Assignment shall be binding upon and shall inure to the benefit of the parties hereto and their respective legal representatives, heirs, successors and permitted assigns. Assignor shall not assign any obligation hereunder to any Person.

(13) Assignee assumes all liabilities of Company.

(14) Assignee shall keep all monies currently in Company's business account. Separate account which holds tenant's security deposits, shall be turned over to Assignee.

(15) Assignee shall be responsible for any tax associated with this transfer, including transfer tax; and Assignee hereby indemnifies Assignor, and agrees to hold Assignor harmless, from and against all loss, liability, damage and expense, including attorneys' fees and expenses, suffered or incurred by Assignor, with respect to same.

IN WITNESS WHEREOF, the Assignor has executed this Assignment as of the date first written above.

_____
Yoel Abraham - Owner

STATE OF NEW YORK)
                              ) SS:
COUNTY OF _Ro C K_      )

On the 2 day of _Aujust_, in the year 2022, before me, the undersigned, personally appeared **YOEL ABRAHAM**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s) or the person(s) upon behalf of which the individual(s) acted, executed the instrument

_____
          NOTARY PUBLIC

HASKELL ROSENFELD
Notary Public, State of New York
Reg. No. 02RO5252840
Qualified in Rockland County 23
Commission Expires Dec. 12, 2019

IN WITNESS WHEREOF, the Assignee has executed this Assignment as of the date first written above.

10 Mountain View Holdings LLC

_____

By: _____
     (print name and title):

STATE OF NEW YORK)
                              ) SS:
COUNTY OF _____)

On the ____ day of _____, in the year 2022, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s) or the person(s) upon behalf of which the individual(s) acted, executed the instrument

_____
     NOTARY PUBLIC

IN WITNESS WHEREOF, the Assignor has executed this Assignment as of the date first written above.

_____

Yoel Abraham

STATE OF NEW YORK)
                          ) SS:
COUNTY OF _____)

On the ___ day of _____, in the year 2022, before me, the undersigned, personally appeared **YOEL ABRAHAM**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s) or the person(s) upon behalf of which the individual(s) acted, executed the instrument

_____

NOTARY PUBLIC

IN WITNESS WHEREOF, the Assignee has executed this Assignment as of the date first written above.

10 Mountain View Holdings LLC

_____

By (print name and title): _____

STATE OF NEW YORK)
                          ) SS:
COUNTY OF Rockland          )

On the 3rd day of August, in the year 2022, before me, the undersigned, personally appeared Herschel Blumenberg, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature(s) on the instrument, the individual(s) or the person(s) upon behalf of which the individual(s) acted, executed the instrument

_____

NOTARY PUBLIC

TOBY KAGAN
Notary Public, State of New York
Registration No. 02KA6304101
Qualified in Rockland County
Commission Expires May 19, 2026

Appendix A

## DEFINITIONS

"Action" means any audit or investigation by any Governmental Authority or any action, suit, arbitration or other proceeding of any kind by or involving any Person, including, but not limited to, any Governmental Authority.

"Affiliate" means any Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified. For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise and, in any event and without limitation of the previous sentence, any Person owning fifty percent (50%) or more of the voting securities of a second Person shall be deemed to control that second Person.

"Assets" of any Person means all assets of every kind, nature, character and description (whether real, personal or mixed, whether tangible or intangible, whether absolute, accrued, contingent, fixed or otherwise and wherever situated), including the goodwill related thereto, operated, owned or leased by such Person, including without limitation cash, cash equivalents, Assets, accounts and notes receivable, chattel paper, documents, instruments, general intangibles, real estate, equipment, inventory, goods and Intellectual Property.

"Contract" means any contract, lease, evidence of Indebtedness, mortgage, indenture, security agreement or other agreement (in each case, whether written or oral).

"GAAP" means United States generally accepted accounting principles, consistently applied throughout the specified period and in the immediately prior comparable period; provided that in the case of any item for which GAAP would authorize more than one accounting method or principle, then "GAAP" shall mean the accounting method or principle used by the Company in the ordinary course during 2007 and 2008 and if no GAAP-authorized accounting method or principle was used by the Company in the ordinary course during 2007 and 2008, then "GAAP" shall mean the GAAP-authorized accounting method or principle elected by the Buyer in its reasonable discretion.

"Governmental Authority" means (i) the United States and any state, county, city or other political subdivision thereof, (ii) any foreign country or any state, province, county, city or other political subdivision thereof, and (iii) any executive or other official or individual acting with the power of or derived from any entity referred to in item (i) or item (ii) above, and any court, tribunal, governmental arbitrator, authority, agency, commission, service or other instrumentality of any entity referred to in item (i) or item (ii) above.

"Indebtedness" of any Person means all obligations of such Person (i) for borrowed money, (ii) evidenced by notes, bonds, debentures or similar instruments, (iii) for purchase money obligations including the deferred purchase price of goods or services (other than trade payables or accruals incurred in the ordinary course of business), (iv) under capital leases or (v) in the nature of guarantees of the obligations described in clauses (i) through (iv) above of any other Person, including but not limited to any of such items that is or was incurred in connection with the purchase of equipment or tangible personal property.

"Knowledge" or language of similar import means those matters of which the applicable Person is "aware" and all matters actually known by such Person and which should be known by such Person after due diligence and reasonable investigation.

"Law" or "Laws" means all laws, statutes, rules, regulations, ordinances and other pronouncements having the effect of law of the United States, any foreign country or any domestic or foreign state, county, city or other political subdivision or of any Governmental Authority.

"Licenses" means all licenses, permits, certificates of authority, authorizations, approvals, registrations, franchises and similar consents granted or issued by any Governmental Authority.

"Lien" means any mortgage, pledge, hypothecation, assessment, security interest, lease, lien (statutory or other), adverse claim, levy, charge or other encumbrance of any kind, or any conditional sale Contract, title retention Contract or other Contract to give any of the foregoing.

"Losses" means any and all losses, debts, liabilities, damages, fines, fees, penalties, deficiencies, obligations, claims, demands, payments, judgments or settlements of any nature or kind, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, whether arising from a third-party claim or otherwise, including all reasonable costs and expenses (including, without limitation, court costs, fees of attorneys, accountants and other experts or other expenses of litigation or other proceedings or of any claim, default or assessment or otherwise), in connection with the investigation, defense, prosecution or enforcement of any claim. The amount of any Loss shall be calculated net of any insurance proceeds related to such Loss that are recovered. A "Loss" is any one of the foregoing.

"Material Adverse Effect" means (a) with respect to the Company, (i) a change in (or effect on) the condition (financial or otherwise), properties, assets (including intangible assets), liabilities (including contingent liabilities), rights, obligations, operations, business or prospects, which change (or effect), individually or in the aggregate, is materially adverse to the financial condition, properties, assets, liabilities, rights, obligations, operations, business or prospects of the Company; or (ii) a material adverse effect on the ability of the Assignor or the Company to consummate the Transactions, and (b) with respect to the Assignee, a material adverse effect on its ability to consummate the transactions contemplated herein.

"Order" means any writ, judgment, decree, injunction or similar order or pronouncement of any Governmental Authority (in each such case whether preliminary or final).

"Person" means any natural person, corporation, general partnership, limited partnership, limited liability company, limited liability partnership, proprietorship, joint venture, other business organization, trust, union, association or Governmental Authority of any nature.

"Real Property" means the real property commonly referred to as 10 Mountainview Road, Upper Saddle River, New Jersey.

"Tax" means any tax, charge, fee, levy, deficiency or other assessment of whatever kind or nature including, without limitation, any net income, gross income, profits, gross receipts, real or personal property, sales, ad valorem, withholding, social security, retirement, excise, employment, unemployment, minimum, estimated, severance, stamp, occupation, environmental, windfall profits, use, service, net worth, payroll, franchise, license, gains, customs, transfer, recording and other tax, duty, fee, assessment or charge of any kind whatsoever, imposed by any Tax Authority, including any liability therefore as a transferee (including without limitation under Code Section 6901 or any similar provision of applicable law), as a result of Treas. Reg. §1.1502-6 or any similar provision of applicable law, or as a result of any tax sharing or similar agreement, together with any interest, penalties or additions to tax relating thereto.

"Tax Authority" means any branch, office, department, agency, instrumentality, court, tribunal, officer, employee, designee, representative, or other Person that is acting for, on behalf, or as a part of any foreign or domestic government (or any state, local or other political subdivision thereof) that is engaged in or has any power, duty, responsibility or obligation relating to the legislation, promulgation, interpretation, enforcement, regulation, monitoring, supervision or collection of or any other activity relating to any Tax or Tax Return.

"Tax Return" means any return, election, declaration, report, schedule, information return, document, information, opinion, statement, or any amendment to any of the foregoing (including without limitation any consolidated, combined or unitary return) submitted or required to be submitted to any Tax Authority.

"Third Party Claim" means any claim or demand is asserted against or sought to be collected from-by any Person other than a party hereto.

# EXHIBIT 3

# KASOWITZ BENSON TORRES LLP

JENNIFER S. RECINE
DIRECT DIAL: (212) 506-1916
DIRECT FAX: (212) 500-3416
JRecine@kasowitz.com

1633 BROADWAY
NEW YORK, NEW YORK 10019
(212) 506-1700
FAX: (212) 506-1800

ATLANTA
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

December 9, 2022

**VIA EMAIL & OVERNIGHT DELIVERY**

Abraham Lowy, Esq.
Treff & Lowy PLLC
481 Wythe Avenue
Brooklyn, New York 11249

Avery S. Mehlman, Esq.
Herrick, Feinstein LLP
Two Park Avenue
New York, New York 10016

> **Re:    10 Mountainview Road, Upper Saddle River, New Jersey (the "Property")**

Dear Messrs. Lowy and Mehlman:

We represent Viewstar LLC ("Viewstar" or the "Borrower") in connection with a subordinated commercial real estate loan made by your client, 10 Mountainview, LLC ("10 Mountainview" or the "Subordinated Lender"), on or about April 1, 2020, and secured by a mortgage on the Property (the "Subordinated Debt").

The Subordinated Lender claims to have certain rights as a so-called "Springing Member" of Viewstar, including the exclusive rights to manage the Borrower and market and sell the Property (the "Springing Rights"). On its face, the Springing-Member construct was devised as an end-run around the foreclosure process so that it could take ownership and control of the Borrower and Property without commencing a foreclosure action and without regard to the rights of the senior lender or Borrower. The Springing Rights are void and unenforceable as they violate numerous contractual rights of the senior lender, inhibit the Borrower from performing under the senior debt instruments and applicable "Subordination Agreement,"[1] and because they plainly violate the unwaivable rights of a mortgage borrower under state law and public policy.

---

[1] The "Subordination Agreement" refers to the Subordination Agreement among Sterling National Bank (the predecessor of the current senior lender), 10 Mountainview, and Viewstar, dated April 1, 2020.

K ASOWITZ  B ENSON  T ORRES  LLP

Abraham Lowy, Esq.
Avery S. Mehlman, Esq.
December 9, 2022
Page 2


Further, under the plain language of the Subordinated Lender's "Mortgage Note," the Subordinated Lender is not entitled to default interest prior to the maturity date.

Accordingly, we write to demand that 10 Mountainview immediately (i) withdraw its claim to hold the rights to manage the Borrower and market the Property and (ii) withdraw its assertion that it is entitled to default interest prior to the maturity date, September 10, 2022. Failure to agree to these terms by December 12, 2022 will result in litigation in New York State Supreme Court, in the form of intervention in the current litigation with the senior lender and/or as a related case.

### A.    The Springing Rights Are Unenforceable

The Springing Rights purport to provide greater remedies to the Subordinated Lender than are available to the senior lender. These provisions violate numerous terms of the Subordination Agreement.

Viewstar LLC was formed on or about March 12, 2020, as a New Jersey limited liability company. The "Operating Agreement" lists one member and a so-called Springing Member—10 Mountainview—whose interest purports to spring into existence upon the occurrence of a "Springing Member Event." Springing Member Events consist of eight enumerated occurrences, including—primarily—Viewstar's default on its debt or its failure to pay a specified "Redemption Amount" to the Subordinated Lender before the maturity date of the Subordinated Debt.

Upon the occurrence of a Springing Member Event, the Subordinated Debt is converted from debt to a controlling equity interest in Viewstar, with a contribution amount of the face value of the Subordinated Debt, $4.2 million. In such a case, the Springing Member purportedly has the sole rights to manage Viewstar and the Property, including the rights to: (a) remove and replace the existing managing member and assume that role; (b) unilaterally take a "Major Action" under the Operating Agreement, (c) make distributions to itself until it receives the Redemption Amount, and (d) sell the Property "at a price and terms decided solely by Springing Member and that the proceeds from said sale may only be enough to make Distributions to Springing Member towards the Redemption Amount."

Even absent a Springing Member Event, the Springing Member purports to wield significant control over Viewstar, including the right to approve (or veto) a Major Action. Major Actions include borrowing any funds, refinancing or modifying existing loans, entering into a material agreement, engaging in a merger, or filing a bankruptcy petition.

These putative Springing Rights—including its core debt-to-equity conversion feature—are unenforceable because they violate numerous terms of the Subordination Agreement, including but not limited to the following provisions:

- Section 4: "[A]ll Senior Debt shall be paid in full (in cash) before any payment is made on any Subordinated Debt."

KASOWITZ BENSON TORRES LLP

Abraham Lowy, Esq.
Avery S. Mehlman, Esq.
December 9, 2022
Page 3

- Section 5. "Purchase or Redemption of Subordinated Debt. Neither Borrower nor any party under its control will purchase, redeem or otherwise acquire any right, title or interest in any or all of the Subordinated Debt."

- Section 6. "Conversions of Subordinated Debt. Neither Junior Creditor nor Borrower will convert any or all of the Subordinated Debt into equity securities."

- Section 10. "Payments and Distributions Contrary to Subordination Agreement. All payments or distributions upon, or redemptions of, or with respect to any Subordinated Debt which are received by Junior Creditor contrary to the provisions of this Subordination Agreement, shall be received in trust for the benefit of Lender, shall be segregated from other funds and property held by Junior Creditor, and shall be forthwith paid over to Lender in the same form as so received (with any necessary endorsement) to be applied (in the case of cash) to, or held as collateral (in the case of securities or other non-cash property) for, the payment or prepayment of the Senior Debt."

- Section 16. "Covenants. Junior Creditor agrees that . . . . (4) Transfer of Subordinated Debt. Junior Creditor will not (a) sell, assign (by operation of law or otherwise), transfer or otherwise dispose of any of the Subordinated Debt, or (b) enter into an agreement for the sale, assignment, transfer or other disposition of any or all of the Subordinated Debt. (5) Modification of Subordinated Debt. No documents evidencing the Subordinated Debt shall be modified without the prior written consent of Lender, which may be given or withheld in its sole discretion."

The Subordinated Debt, coupled with the Springing Rights contained in the Operating Agreement, violates each of the above provisions of the Subordination Agreement. Further, the Springing Rights wholly undermine the Borrower's ability to comply with its obligations under the senior debt instruments and the Subordination Agreement. For example, the Springing Rights provide that all distributable funds of the Borrower will be paid to the Subordinated Lender until the Redemption Amount is paid, rather than to the senior lender, as required by the applicable agreements. Accordingly—considering the priority of rights and remedies granted to the senior lender and the Subordinated Lender and Borrower's agreement to comply with the terms of the Subordination Agreement —the Springing Rights under the Operating Agreement are void *ab initio* and unenforceable.[2]

---

[2] In its current litigation with the senior lender, the Subordinated Lender has represented that the "Subordination Agreement is a valid, enforceable, and binding contract, with respect to which [10 Mountainview] has full performed." (No. 654207/2022, Dkt. No. 5, at p.6.) As described herein, the Subordinated Lender's representation to the court regarding its performance under the Subordination Agreement is contrary to the actual facts.

# KASOWITZ BENSON TORRES LLP

Abraham Lowy, Esq.
Avery S. Mehlman, Esq.
December 9, 2022
Page 4


In addition, the Springing Rights are void as contrary to public policy.  As explained above, upon a maturity default, the Springing Rights provide that the Springing Member automatically takes ownership and full control over the Borrower, maintains the sole and exclusive rights to market and sell the Property, and controls the distribution of all of the Borrower's funds, without the need for a statutory foreclosure process.  Such rights cannot be acquired by a mortgage lender in connection with the making of a loan because they clog (and eliminate) the equity right of redemption of the Borrower and the protections afforded by the statutorily-required foreclosure process.

New Jersey courts have recognized the rule that "a mortgagor's equity of redemption cannot be clogged and that he cannot, as a part of the original mortgage transaction, cut off or surrender his right to redeem.  Any agreement which does so is void and unenforceable as against public policy." *Humble Oil & Ref. Co. v. Doerr*, 123 N.J. Super. 530, 544 (Ch. Div. 1973).  As the *Humble* court explained:

> The debtor or mortgagor cannot, in the inception of the instrument, as a part of or collateral to its execution, in any manner deprive himself of his equitable right to come in after a default in paying the money at the stipulated time, and to pay the debt and interest, and thereby to redeem the land from the lien and encumbrance of the mortgage; the equitable right of redemption, after a default is preserved, remains in full force, and will be protected and enforced by a court of equity, no matter what stipulations the parties may have made in the original transaction purporting to cut off this right

*Id*. at 545.[3]

The Springing Rights are precisely the type of unlawful arrangement which cuts off the Borrower's unwaivable right of redemption for both the senior debt and the Subordinated Debt and eliminates the protections afforded the Borrower under state law and therefore are void and unenforceable as a matter of contract, state law, and public policy.[4]

B.    **The Subordinated Lender Is Not Entitled to Default Interest Prior to Maturity**

On November 17, 2022, the Subordinated Lender delivered a payoff letter which improperly included nearly $2 million in default interest from April 7, 2020 to September 10, 2022 (the maturity date).  The Subordinated Lender is not entitled to default interest prior to the maturity date.

---

[3] The Springing Rights are equally unenforceable under New York law.  *See* NY General Obligations Law § 5-334.

[4] Even if the Springing Rights were enforceable, the Subordinated Lender would be operating under a classic conflict of interest in marketing and selling the property and would likely subject itself to fiduciary-duty violations and other forms of lender liability.

K A S O W I T Z   B E N S O N   T O R R E S   LLP

Abraham Lowy, Esq.
Avery S. Mehlman, Esq.
December 9, 2022
Page 5

The Mortgage Note provides:

> In the event the principal indebtedness evidenced by this Note becomes due and payable by the terms hereof or by reason of the holder hereof exercising its option to call the same due, interest thereafter shall accrue at the lower of (a) the highest rate permitted by applicable law or (b) twenty-four (24%) percent per annum ("Default Rate") and such interest shall continue to accrue and be payable at the rate or rates herein specified and the same shall be collectible in any action to enforce this Note and/or foreclose the mortgage securing this Note.

By the Mortgage Note's plain language, the Default Rate only applies once the loan has matured. No other provisions of the Note allow the Default Rate of interest to be assessed prior to maturity—even if a default has occurred—unless the debt was called (which it was not in this case). Accordingly, the Subordinated Lender is not entitled to charge default interest prior to September 10, 2022 and is in breach of the Mortgage Note by claiming such interest.[5]

* * *

In light of the foregoing, we demand that 10 Mountainview immediately (i) withdraw its claim to hold the rights to manage the Borrower and market the Property and (ii) withdraw its assertion that it is entitled to default interest prior to the maturity date, September 10, 2022.

Please confirm your agreement to these terms no later than December 12, 2022 at 5 PM EST. Failure to agree by such time will result in litigation in New York State Supreme Court, by way of intervention in the current litigation with the senior lender and/or as a related case.

This letter is without prejudice to Viewstar LLC's rights and remedies, all of which are expressly preserved.

Sincerely,

Jennifer S. Recine

JSR

---

[5] Default interest is likewise not allowed under the Viewstar Operating Agreement, as the Redemption Amount does not include any interest above 4.5% per annum.

# EXHIBIT 4

**WRITTEN CONSENT IN LIEU OF A MEETING**
**OF THE MANAGING MEMBER**
**OF**
**VIEWSTAR LLC,**
**a New Jersey limited liability company**

**As of November 29, 2023**

10 Mountainview LLC, a New York limited liability company ("Mountainview"), being the Managing Member of Viewstar LLC, a New Jersey limited liability company (the "Company"), acting by written consent without a meeting in accordance with Section 42:2C-37 of the New Jersey Revised Statutes, hereby consents to and adopts the following resolutions effective as of the date first set forth above:

**WHEREAS**, reference is hereby made to that certain Operating Agreement of the Company, dated as of April 1, 2020 (the "Operating Agreement"), by and between Yoel Abraham ("YA"), as the Member of the Company, and Mountainview, as the Springing Member of the Company upon the occurrence of a Springing Member Event;

**WHEREAS**, pursuant to the terms of the Operating Agreement, YA was designated and appointed the Managing Member and the Manager of the Company;

**WHEREAS**, pursuant to Section 3.11 of the Operating Agreement, upon the occurrence of a Springing Member Event, the Springing Member shall automatically be admitted to the Company as the Managing Member;

**WHEREAS**, pursuant to Section 4.1(j) of the Operating Agreement, upon the occurrence of a Springing Member Event, the Springing Member shall have the right to remove and appoint a new Manager and/or remove and replace YA as the Managing Member;

**WHEREAS**, pursuant to Section 4.1(j) of the Operating Agreement, if the Springing Member removes or replaces the Manager and/or Managing Member, the sole management of the Company shall vest with the new Manager and/or Managing Member;

**WHEREAS**, certain actions of YA have resulted in a Springing Member Event (the "YA Springing Member Event"), thereby resulting in Mountainview being admitted as the Springing Member, as evidenced by an Order of the Chancery Division of the Superior Court of New Jersey dated as of November 29, 2023 (the "Effective Date");

**WHEREAS**, as a result of the YA Springing Member Event and Mountainview's admission to the Company as a Springing Member, Mountainview was admitted to the Company as the Managing Member as of the Effective Date and, accordingly, the sole management of the Company vests with Mountainview (the "Managing Member Admission");

**WHEREAS**, as of the Effective Date, Mountainview desires to formally acknowledge and accept the Managing Member Admission;

**WHEREAS**, as a result of the Managing Member Admission, Mountainview desires to formally acknowledge and recognize, as of the Effective Date, (i) Mountainview's replacement of YA as the Managing Member (the "YA Replacement") and (ii) the removal of YA as the Manager (the "YA Removal");

**WHEREAS**, Mountainview, as the Springing Member, desires to appoint Mountainview, or its designee, as the Manager of the Company as of the Effective Date; and

**WHEREAS**, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Operating Agreement.

**NOW, THEREFORE, BE IT RESOLVED**, as of the Effective Date and pursuant to the terms of the Operating Agreement, Mountainview hereby formally acknowledges, recognizes and accepts, as applicable, (i) the Managing Member Admission; (ii) the YA Replacement; and (iii) the YA Removal; and be it further

**RESOLVED**, that, as of the Effective Date, Mountainview, or its designee, be, and hereby is, appointed as Manager of the Company, to serve in such capacity until its successor has been duly appointed and qualified, or until its earlier resignation or removal; and be it further

**RESOLVED**, that Mountainview be, and hereby is, authorized and empowered, in the name and on behalf of the Company to do and perform, or cause to be done and performed, any and all such other acts, deeds and things and to make, execute, deliver, register and file or cause to be made, executed, delivered, registered and filed, in the name and on behalf of the Company, and under the Company's seal, if requested or required, any and all such other agreements, undertakings, documents, notices, consents, filings or certificates, with such terms and provisions as Mountainview may approve, to incur and pay all such fees and expenses and to engage such persons as Mountainview may, in its judgment, deem necessary, proper or desirable to effectuate or carry out fully the intent and purposes of the foregoing resolutions; and be it further

**RESOLVED**, that all lawful actions heretofore taken by Mountainview in connection with or relating to the subject matter of any and all of the foregoing resolutions that are within the authority conferred by the foregoing resolutions be, and each of them hereby is, approved, ratified and confirmed in all respects as the act and deed of the Company.

**IN WITNESS WHEREOF**, the undersigned has executed this Written Consent as of the date and year first written above.

**MANAGING MEMBER:**

10 MOUNTAINVIEW LLC,
a New Jersey limited liability company

By: _____
Name: Moshe Gold
Title:   Authorized Signatory